UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEFFREY L. GRAUBART,

                              Plaintiff,

       -v-

JAZZ IMAGES, INC. and BURRILL CROHN,

                              Defendants.

Case No. 02-CV-4645 (KMK)

OPINION AND ORDER

Appearances:

Edward L. Smith, Esq.
Hollyder, Brady, Barrett & Hines, LLP
New York, New York
*Counsel for Plaintiff*

Steven H. Robinson, Esq.
New York, New York
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Before the Court is the Motion of Defendants, Jazz Images, Inc. ("JII") and Burrill Crohn, to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). Specifically, Defendants claim that to a legal certainty, Plaintiff cannot satisfy the jurisdictional amount of damages needed for diversity jurisdiction. Defendants also move to dismiss the claims set forth in Counts II-VII of the Complaint and Count I to the extent that it applies to any period prior to June 17, 1996, for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons given below, the Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), is GRANTED.

## I. Background

### A. Factual Background

Defendant JII was formed on approximately June 1, 1983, by Plaintiff Jeffrey L. Graubart, Defendant Burrill Crohn, and David Chertok (since deceased).  (Compl. ¶¶ 6, 12)  JII is in the business of creating and producing music documentary films for distribution both in the United States and abroad.  (Compl. ¶ 9)  Graubart, Crohn, and Chertok were each one-third shareholders of JII and were the sole officers and directors of the company.  (Compl. ¶ 8)  As is often the case in a small corporation, after a few years, the principals (Graubart, Crohn, and Chertok) decided to partially part ways.  On December 31, 1986, Graubart, Crohn, and Chertok entered into a contract ("Termination Agreement" or "Agreement") where Graubart, an attorney, resigned from JII and surrendered all of his shares in JII in exchange for, *inter alia*, a one-time payment, a repayment of loans and advances, and a continuing percentage of JII's net profits based on a formula outlined in the Agreement.  (Compl. ¶ 10; Crohn Aff. Ex. A)  The Termination Agreement also imposed a concomitant obligation on JII to supply Graubart with "detailed statements" of the monies due under the Agreement within ninety days after the close of each calendar year, accompanied by a payment of the monies due.  (Compl. ¶ 10; Crohn Aff. Ex. A)  Such statements were, by the terms of the Agreement, "considered binding and not subject to audit unless such audit is commenced with[in] twenty-four (24) months following receipt of [a] statement to which objection is made."  (Crohn Aff. Ex. A ¶ 3.E)  The Termination Agreement also provided an indemnity provision for Graubart stating that "[i]n the event of any Action against me," he could hold JII "responsible for all damages and reasonable costs incurred by me in the defense, settlement or compromise thereof."  (Crohn Aff. Ex. A ¶ 6)

The Complaint asserts seven causes of action.[1]  Namely, Plaintiff seeks relief for claims of (i) breach of contract, (ii) accounting, (iii) fraud, (iv) constructive trust, (v) breach of fiduciary duty, (vi) restitution of unjust enrichment, and (vii) conversion.  Notwithstanding the multiple causes of action, Graubart's case boils down to the single allegation that Defendants did not adequately perform under the Termination Agreement and therefore are in breach of contract.  (Compl. ¶¶ 16-18)  Specifically, Graubart alleges that Defendants failed to render to him a proper statement of the monies due to him under the Termination Agreement for the years 1984 to the date of the filing of the Complaint (June 17, 2002).  (Compl. ¶¶ 13-14)  Further, the Complaint alleges Defendants have failed, in violation of the Termination Agreement, to make any payment to Plaintiff since 1998.  (Compl. ¶ 15)  The Parties engaged in some jurisdictional discovery relating to Defendants' financials and the correspondence relating to the Parties' interaction under the Termination Agreement.

Defendants filed a Motion to Dismiss Plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6).  Defendants contend that the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) because the amount in controversy is not, and never has been, at or above the jurisdictional threshold.  Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants also move to dismiss Claims II-VII on the grounds that those claims fail to state a claim upon which relief may be granted and are time-barred.  Specifically, Defendants argue that these claims are merely duplicative of the breach of contract claim as they do not allege the

---

[1]Plaintiff filed the Complaint on June 17, 2002.  The case was reassigned to this Court on September 20, 2004.

additional elements necessary to bring the claims outside of the breach of contract claim. As

redundant claims, Defendants argue they warrant dismissal. Defendants also assert that Claim I

in the Complaint, breach of contract, is time-barred prior to June 17, 1996. Finally, Defendants

argue that the Termination Agreement is void as to Burrill Crohn. In the event that the case is

dismissed as to Burrill Crohn, Defendants contend that venue would be improper as to JII and

therefore should be dismissed pursuant to Fed. R. Civ. P. 12(b)(3).[2]

## II. Discussion

### A. Legal Standard for Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) requires a district court to dismiss a complaint

when it lacks "jurisdiction over the subject matter." Fed. R. Civ. P 12(b)(1). In defending a

motion to dismiss for lack of subject matter jurisdiction, Plaintiffs bear the burden of "showing

by a preponderance of the evidence that subject matter jurisdiction exists." *Lunney v. United*

*States*, 319 F.3d 550, 554 (2d Cir. 2003) (citations omitted). In considering such a motion, while

the Court "must accept as true all material factual allegations in the complaint," it is "not to draw

inferences from the complaint favorable to plaintiffs." *J.S. ex rel. N.S. v. Attica Central Sch.*,

386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131

(2d Cir. 1998)). In fact, "where jurisdictional facts are placed in dispute, the court has the power

---

[2]The Court considered converting Defendants' Motion to Dismiss to a Motion for
Summary Judgment under Federal Rule of Civil Procedure 56. (*See* Order, Feb. 27, 2006)
However, in light of the fact that a court may consider evidence outside of the pleadings when
considering a Motion to Dismiss for lack of subject matter jurisdiction, the Court finds that
unnecessary. *See Markova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a
motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . .
may refer to evidence outside the pleadings." (citation omitted)). The Court still reviewed and
considered the Parties' submissions in response to the February 27 Order.

and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999); *accord J.S. ex rel. N.S.*, 386 F.3d at 110; *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003); *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 255 n.30 (2d Cir. 2003).

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Magee v. Nassau County Med. Ctr.*, 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998) (citing *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)).

     B.  Diversity Jurisdiction - Jurisdictional Amount

Plaintiff's sole basis for jurisdiction as alleged in the Complaint is diversity. (Compl. ¶ 4) Under 28 U.S.C. § 1332(a), the district courts have original jurisdiction over all "civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between . . . citizens of different States . . . ." 28 U.S.C. § 1332(a); *see also Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 136 (2d Cir. 2002) (citing 28 U.S.C. § 1332). It is well accepted that "'if subject matter jurisdiction is lacking, the action must be dismissed.'" *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193 (2d Cir. 2003) (quoting *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700-01 (2d Cir. 2000)).

"A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount." *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) (citing *Moore v. Betit*, 511 F.2d 1004, 1006 (2d Cir. 1975)). As with other general jurisdictional facts,

the party claiming jurisdiction "must support the jurisdictional amount with competent proof and justify its allegations by a preponderance of the evidence." *Lasala v. E\*Trade Sec. LLC*, No. 05 Civ. 5869, 2005 WL 2848853, at *3 (S.D.N.Y. Oct. 31, 2005) (quotations and citations omitted); *accord Romano v. MTI/The Image Group, Inc.*, No. 01 Civ. 6201, 2003 WL 22203735, at *2 (S.D.N.Y. Sept. 22, 2003) (citation omitted). This burden is "hardly onerous," for it presumes "that the face of the complaint is a good faith representation of the actual amount in controversy." *Scherer v. Equitable Life Assurance Soc'y of the United States*, 347 F.3d 394, 397 (2d Cir. 2003) (citing *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999)). To overcome the face of the complaint presumption, the party opposing jurisdiction must show "'to a legal certainty'" that the amount recoverable is below the jurisdictional threshold. *Wolde-Meskel*, 166 F.3d at 63 (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938)).

The Second Circuit has "set a high bar for overcoming this presumption," *Scherer*, 347 F.3d at 397, noting that "'the legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith in asserting the claim.'" *Id.* (quoting *Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Trust Co. of Chicago*, 93 F.3d 1064, 1070-71 (2d Cir. 1996)). In determining what it means to show to a "legal certainty" that the amount recoverable is below the jurisdictional amount the Second Circuit requires that the Court "measure the amount in controversy as of the date of the complaint." *Id.* This simply means that "[e]vents occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction." *St. Paul Mercury Indem. Co.*, 303 U.S. at 289-90 (citations omitted); *see also Wolde-Meskel*, 166 F.3d at 63 (subsequent events "such as a valid defense

offered by the defendant, or actual recovery in an amount less than the minimum jurisdictional

amount" do not oust jurisdiction). However, even when plaintiffs commence a suit with the

good faith belief that their claim is over the statutory jurisdictional amount, if the actual amount

in controversy is later determined to be below the statutory jurisdictional amount as of the date of

the filing of their claim, the case should be dismissed for want of jurisdiction. *See Tongkook*, 14

F.3d at 785 ("We accept [Plaintiff's] assertion that, at the time it instituted suit, it believed the

amount in controversy exceeded the statutory jurisdictional amount. However, good faith has an

objective element, and we cannot ignore what pre-trial discovery revealed – that from the outset,

[Plaintiff], to a 'legal certainty,' could not recover the statutory jurisdictional amount. A

plaintiff's subjective belief, alone, cannot be the controlling factor where, pre-trial, there is a

showing that, as a legal certainty, the plaintiff cannot recover the jurisdictional amount."

(quotations and citations omitted)); *accord Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 507

(2d Cir. 2005).

In determining whether a complaint appears to a "legal certainty" to assert claims for less

than the jurisdictional amount, the Court is required to aggregate all of the plaintiff's claims. *See*

*Wolde-Meskel*, 166 F.3d at 62. Additionally, the Court should include plaintiff's punitive

damage claims in this calculation to the extent they can be recovered under the applicable state

law. *See A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991) ("[I]f punitive

damages are permitted under the controlling law, the demand for such damages may be included

in determining whether the jurisdictional amount is satisfied." (citation omitted)); *see also Miller*

*v. European Am. Bank*, 921 F. Supp. 1162, 1167 (S.D.N.Y. 1996) ("In determining the amount in

controversy, the Court may also consider bona fide claims for punitive damages." (citing *Bell v.*

*Preferred Life Assur. Soc.*, 320 U.S. 238 (1943))). "However, the use of punitive damages to satisfy the jurisdictional amount warrants 'special judicial scrutiny.'" *Miller*, 921 F. Supp at 1167 (quoting *Career Initiatives Corp. v. Palmer*, 893 F. Supp. 295, 296 (S.D.N.Y. 1995)); *see also Zahn v. Int'l Paper Co.*, 469 F.2d 1033, 1034 n.1 (2d Cir. 1972) ("[I]n computing jurisdictional amount, a claim for punitive damages is to be given closer scrutiny . . . than a claim for actual damages." (citation omitted)). Notably, "[a] trial court is not compelled to accept a claim for punitive damages made for the purposes of conferring jurisdiction." *Career Initiatives Corp.*, 893 F. Supp. at 296.

The Court has little difficulty in concluding that Plaintiff's claims for non-contractual and punitive damages should not be aggregated and always has been, to a "legal certainty," otherwise unrecoverable. Plaintiff's tort claims asserted in Claims II-VII are merely duplicative of the contract claim and allege no violation of a legal duty independent of the underlying contract and therefore should be disregarded as superfluous. Applying New York law, it is well settled that

> a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193-94 (N.Y. 1987) (citations omitted); *see also Hall*, 396 F.3d at 508 (applying similar California law, the Second Circuit held that "[i]f the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." (quotation and citations omitted)). A tort claim is barred as redundant

where it is "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract." *Clark-Fitzpatrick, Inc.*, 516 N.E.2d at 194. Here, there is no dispute over whether there is a valid contract governing Plaintiff's claims. Thus, Plaintiff's non-contract claims merely are barely concealed restatements of his contract claim. Further, Plaintiff's bad faith in asserting these non-contract claims is glaringly obvious as attested to by Plaintiff's counsel's complete lack of defense of these claims in his Response Brief and by his immediate and barely solicited concession at oral argument that the Complaint fails to make out any of these tort claims.[3] (Hr'g. Tr. 3-4, Dec. 19, 2005 ("12/19/05 Tr.")) In other words, by discarding the tort claims as redundant, the Court is not reducing the jurisdictional amount of damages at issue by any event that post-dates the Complaint. Instead, the Court finds that as of the filing of the Complaint, the non-contract claims cannot be aggregated to determine the jurisdictional amount.

Plaintiff's claims for punitive damages are equally unavailing. Under New York law, punitive damages are available in actions for breach of contract "only 'if necessary to vindicate a public right.'" *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 94 (2d Cir. 2005) (quoting *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 315 (1995)). Plaintiff has made no allegation or showing that his claims for punitive damages are necessary to vindicate a public right and, as a result, Plaintiff's punitive damages are, to a "legal certainty,"

---

[3]*Cf. Admerasia, Inc. v. United States Postal Serv.*, No. 00 Civ. 9784, 2004 WL 895552, at *5 n.6 (S.D.N.Y. Apr. 27, 2004) (holding certain claims abandoned because plaintiff failed to address defendant's legal arguments in its response brief); *Frink Am., Inc. v. Champion Rd. Mach. Ltd.*, 48 F. Supp. 2d 198, 209 (N.D.N.Y. 1999) ("Plaintiff does not address [defendant's] claims in its opposition papers, leading the Court to conclude that it has abandoned them." (citations omitted)).

unrecoverable. As with the tort claims, Plaintiff's bad faith in asserting his claims for punitive damages is evidenced by Plaintiff's counsel's complete lack of defense of these claims in his Response Brief and by his quick acknowledgment at oral argument that Plaintiff was in no way entitled to punitive damages for any of his claims. (12/19/05 Tr. 3) Therefore, Plaintiff's claims for punitive damages cannot go towards determining the amount in controversy as of the filing of the Complaint. *See Wright v. Carleton Coll.*, No. 00 Civ. 3335, 2000 WL 1474408, at *3-4 (S.D.N.Y. Oct. 4, 2000) (dismissing case for lack of subject matter jurisdiction on account of Plaintiffs not being entitled to include punitive damages in the amount in controversy); *Career Initiatives*, 893 F. Supp. at 296-97 (same).

Plaintiff also asserts that, under the Termination Agreement, he has a claim to attorneys' fees resulting from this dispute and that these fees should go towards determining the amount in controversy. (Pl.'s Mem. of Law in Opp'n to Defs.' Rule 12 Mot. to Dismiss 6-7 ("Pl.'s Mem.")) Plaintiff is correct in noting that "[a] potential award of attorneys' fees may be considered by the court in determining whether a case involves the jurisdictional minimum." *Greenberg v. Trace Int'l Holdings, Inc.*, No. 99 Civ. 0306, 1999 WL 587935, at *4 (S.D.N.Y. Aug. 4, 1999) (quotation and citation omitted). However, Plaintiff fails to note, that "a court can consider attorneys' fees only if they are reasonable and are provided for by contract or state statute." *Id.* (citations omitted); *see also Oscar Gruss & Son, Inc.*, 337 F.3d at 199 ("Under New York law, 'the court should not infer a party's intention' to provide counsel fees as damages for a breach of contract 'unless the intention to do so is unmistakably clear' from the language of the contract." (quoting *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989))); *McGraw-Hill Cos. v. Vanguard Index Trust*, 139 F. Supp. 2d 544, 556 n.6 (S.D.N.Y.

2001) ("Under New York law , 'generally, attorney's fees are not recoverable as damages in an action for breach of contract . . . unless expressly agreed to by the parties.'" (quoting *Equitable Lumber Corp. v. IPA Land Dev. Corp.*, 38 N.Y.2d 516, 519 (1976))).

Plaintiff's self-serving interpretation of the Termination Agreement to grant him the right to attorneys' fees is wholly unpersuasive and borders on the frivolous. There is no question that the provision of the Agreement he cites for this proposition only indemnifies Plaintiff when he is sued by third-party claimants.[4] There is no reasonable interpretation of this provision to include indemnifying Plaintiff for his own claims in upholding the Termination Agreement. *See Oscar Gruss & Son, Inc.*, 337 F.3d at 200 (holding no recovery of attorneys' fees where the subsection of the contract providing for indemnification also contained language that "indisputably applie[d] solely to third-party claims."); *Hooper Assocs., Ltd.*, 548 N.E.2d at 905 (finding the indemnification clause did not reach suits between the parties because, among other reasons, it would render the contract provisions requiring notice and assumption of the defense meaningless). Moreover, as with the punitive damages and non-contract claims, Plaintiff's bad faith in asserting this claim is evidenced by counsel's ready agreement with the Court's interpretation of the indemnification provision at oral argument that it does not provide for attorneys' fees in this action. (12/19/05 Tr. 22-23) Accordingly, attorneys' fees cannot be aggregated to Plaintiff's contract claim for jurisdictional purposes. *See Verosol USA, Inc. v.*

---

[4]The indemnification provision provides, "[i]n the event of any Action *against me* to which the foregoing indemnity relates, I shall promptly notify you of all the details of which I'm aware, and afford you the opportunity to defend, settle or compromise such Action at no expense to me. If you fail or decline to do so, I shall have the right to defend, settle or compromise such Action with counsel of my choice and to hold you responsible for all damages and reasonable costs incurred by me in the defense, settlement or compromise thereof." (Crohn Aff. Ex. A ¶ 6) (emphasis added)

*Florida Shades, Inc.*, No. 91 Civ. 6263, 1992 WL 696643, at *1 (S.D.N.Y. Sept. 17, 1992) (finding contract did not provide for attorneys' fees for the asserted claims and therefore, attorneys' fees could not be included in calculating the amount in controversy). Without the claims asserted in bad faith (i.e., the non-contract claims, punitive damages, and attorneys' fees), Plaintiff's Complaint only supports a contract claim against Defendants. The amount that is in controversy under the contract claim therefore determines whether the Court has subject matter jurisdiction over the case.

### C. Calculating Plaintiff's Maximum Loss from the Alleged Breach of Contract

The Termination Agreement that controls this dispute provides that Graubart was to receive a portion of JII's revenue (the "Graubart Share") derived from certain films designated or described in the Agreement. (Crohn Aff. Ex. A) The amount in dispute here is therefore limited by the maximum amount of the Graubart Share. The Graubart Share is defined in the Agreement to be (1) 12.5% of "all monies received" for the production of the films *Trumpet Kings* and *The John Coltrane Legacy*, less certain expenses including "all documented expenses specifically related to the generation of such monies," and (2) 2.5% of JII's revenues for the production of its next six to eight "productions of the Corporation" under an existing contract with Toei Video Company, Ltd., less similar expenses. (Crohn Aff. Ex. A ¶ 3.A)

In order to determine the maximum amount in controversy before the Court, Defendants adopted some assumptions, all of which generously erred on the side of Plaintiff. First, rather than attempt to trace back Graubart's share to the revenues of the specific films under the Agreement, Defendants assumed that JII's total gross receipts for the time in question, without expenses deducted, could stand in for "all monies received" for those films. (Crohn Aff. ¶ 16)

12

Second, rather than determining which monies should be subject to the 2.5% versus the 12.5% rate in assessing the Graubart Share, Plaintiffs apply, with an exception noted below, the substantially higher 12.5% rate to its gross receipts. (Crohn Aff. ¶ 16) Both of these assumptions clearly favor Plaintiff as they overstate any monies potentially owed to him under the Agreement, and Plaintiff has graciously adopted these assumptions in defending his position. (*See* Pl.'s Mem. 3; 12/19/05 Tr. 18)

Defendants contend that even using these generous assumptions, Plaintiff's damage claims cannot to a degree of legal certainty amount to more than the diversity jurisdictional amount of $75,000. Looking at JII's tax returns for the years 1988-2002, (Crohn Aff. Ex. B) its gross receipts total $785,868.00. Plaintiff confirms this amount. (Pl.'s Mem. 3) Applying the estimating assumptions to these gross receipts, the total amount that Plaintiff would be entitled to is no more than $98,233.50 (12.5% of $785,868.00 equals $98,233.50).

However, this amount must be reduced by whatever demonstrable amounts Defendants have already paid Plaintiff. Between 1991 and 2002, Defendants made various payments to Plaintiff under the Agreement that reduce the potential amount in controversy. During this time period Defendants claim to have paid, and submitted receipts to show, payment of $19,516.98 to Plaintiff for his share. (Crohn Aff. ¶ 21; Crohn Aff. Ex. C) Plaintiff does not contest these payments except to note that Defendants overstated the payments by $1,000 due to Defendants mistakenly including a check for $1,000 that was replaced. (Smith Aff. Ex. C) Therefore, assuming Plaintiff's contention regarding the replaced check as true, Defendants paid Plaintiff at least $18,516.98 under the Agreement for the years 1991-2002. This reduces the amount in controversy to, at most, $79,716.52 ($98,233.50 minus $18,516.98 equals $79,716.52).

But, there are further deductions to this amount related to pre-1991 payments to Plaintiff. On June 21, 1991, JII sent Plaintiff a statement detailing the payments due to Plaintiff under the Termination Agreement for the period between 1983-90 (the "1983-90 Statement" or "Statement"). (Crohn Aff. Ex. D) Under the terms of the Termination Agreement and the calculations in the 1983-90 Statement, the total owed by JII to Graubart through December 31, 1990, was $9,998.33. The Statement details that since JII previously paid Graubart $7,500, the total remaining amount due to Graubart for this time period was $2,498.33 ($9,983.33 minus $7,500 equals $2,498.33). (Crohn Aff. Ex. D) Plaintiff argues that "[t]here is no indication that the $7,500 'already paid' was for his share of the earnings." (Smith Aff. Ex. C) Rather, Plaintiff contends that because he was paid $6,043.63 by JII in 1987 to buy back his JII stock and to repay loans and advances he made to the company, only $1,456.37 of the $7,500, at most, could be attributed to payment of the Graubart Share ($7,500 minus $6,043.63 equals $1,456.37). (Smith Aff. Ex. C) Plaintiff provides no other basis for this $1,456.37 payment, but even Plaintiff agrees that this amount should be deducted from the amount in controversy. (Pl.'s Mem. 3; Pl.'s Aff. Ex. C) These facts, taken as true, also do nothing to challenge the additional $2,498.33 Defendants paid to Plaintiff by JII for his share of the earnings. Defendants paid Plaintiff $2,498.33 for his share of the earnings assessed in the 1983-90 Statement by a check dated June 21, 1991, (Crohn Aff. Ex. D) and Plaintiff acknowledged receipt of this payment in a letter dated September 17, 1991. (Crohn Aff. Ex. D) Thus, this disbursement is not in dispute. Accordingly, subtracting these two acknowledged payments ($2,498.33 plus $1,456.37 equals $3,954.70) by Defendants to Plaintiff for his share of the earnings under the Termination Agreement, the amount in controversy is further reduced to $75,761.82 ($79,716.52 minus $3,954.70 equals

14

$75,761.82).

Thus, by the time the Motion was fully submitted, Plaintiff was clinging to diversity jurisdiction by just over $760. The Court then held oral argument on the Motion to Dismiss on December 15, 2005. At oral argument Defendants suggested that it had additional and irrefutable proof that would further reduce the amount in controversy as of the time of the filing of the Complaint. (12/19/05 Tr. 16-21) Essentially, Defendants argued that since its estimating assumptions clearly overstate the potential amount in controversy, proof of payments to JII that are contained in the gross receipts that can be shown to not fall under the 12.5% Graubart Share should be deducted from the amount in controversy. (12/19/05 Tr. 16-21) Plaintiff did not contest this point. (12/19/05 Tr. 16-21) As a result, the Court instructed Defendants to submit any further documentary proof that it contended would, to a "legal certainty," reduce the amount in controversy. (Order, Jan. 24, 2006)

In response to the Court's instruction, Defendants submitted a copy of an agreement between JII and Hamilton College ("Hamilton"), dated July 22, 1996 and a "General Ledger Detail Trial Balance Report" from Hamilton for July 1, 1996-June 20, 1997, along with a sworn affidavit confirming the validity of these documents signed by the Associate Controller of Hamilton College. (Letter of Steven H. Robinson to the Court, Jan. 31, 2006 ("1/31/06 Letter")) These documents clearly show that Hamilton entered into an agreement with JII in July 1996 to create a new film for Hamilton, and that Hamilton paid JII $67,500 under the contract in 1996-1997. Defendants contend that under the Termination Agreement, Plaintiff was not entitled to any share of the revenues generated by the Hamilton film and therefore, the amount in controversy should be further reduced by 12.5% of the $67,500, which equals $8,437.50.

(1/31/06 Letter)  Plaintiff counters, unpersuasively, that under the Termination Agreement, the

Graubart Share should include the royalties from the Hamilton Film.  (Letter of Edward L. Smith

to the Court, Feb. 13, 2006 ("2/13/06 Letter"))  Yet, Plaintiff concedes that even if the Court

interprets the Termination Agreement in the way he suggests, at most, it only qualifies him to a

royalty rate of 2.5% of the $67,500, and therefore his claim lacks subject matter jurisdiction.

(2/13/06 Letter) ("Mr. Graubart's royalty was limited to 2.5% which, even when added to the

unpaid royalties on the other revenues, would not suffice for the jurisdictional minimum.")  Since

the estimating assumptions overstate the percentage to which Plaintiff was entitled of the

$67,500 by 10% (12.5% minus 2.5% equals 10%), the amount in controversy should be reduced

by $6,750 (10% of $67,500 equals $6,750).  Thus, assuming all facts in Plaintiff's favor, the total

amount in controversy, to a legal certainty is, at most, $69,011.82 ($75,761.82 minus $6,750

equals $69,011.82).[5]

    D.  There is a Legal Certainty that Plaintiff Cannot Recover the Jurisdictional Amount

    As the preceding discussion makes clear, the amount in controversy as of the date of the

filing of the Complaint is to a legal certainty comfortably below the jurisdictional minimum of

$75,000.  Although the facts reducing the amount in controversy below the jurisdictional

threshold may not have been *known* to Plaintiff at the commencement of this action, they were all

facts that *occurred* prior to the commencement of this action.  Similar to the facts in *Tongkook*,

---

    [5]Plaintiff further attempted to increase the amount in controversy by asserting that he also has a claim to his share of JII's earnings since 2002.  Without determining, as a matter of law, whether Plaintiff is entitled to future earnings under the Termination Agreement, Plaintiff did not dispute that, at most, the future earnings under dispute here could not, with legal certainty, amount to more than $700.  (12/19/05 Tr. 22)  Accordingly, at most, the aggregation of these claims only adds $700 to the amount in controversy, resulting in a total still below the jurisdictional threshold.

although Plaintiff asserts that his claims for over $75,000 were made in good faith – a claim that the court finds to be dubious – the irrefutable facts brought out in discovery establish the amount in controversy as of the time of the filing of the Complaint make it legally impossible for him to ever have recovered more than the jurisdictional minimum. *See Tongkook*, 14 F.3d at 785 (stating that although the fact was not uncovered until after discovery began, it was clear from the pre-trial record that plaintiff could not claim the required statutory jurisdictional amount, "and this was true when the action commenced"). Most importantly, as in *Tongkook*, this is not a case "that involves damages that could not be certain at the time of the complaint." *Hall*, 396 F.3d at 507 (citing *Wolde-Meskel*, 166 F.3d at 63). Instead, the damages are clearly quantifiable from the contract at issue.

In the end, Plaintiff does not deny that his claims, as of the date of the filing of his Complaint, demonstrably and irrefutably fail to reach the jurisdictional minimum. In fact, by the end of the briefing of this question, Plaintiff conceded that after he had access to Defendants's tax returns through discovery, "it turned out that his estimate [of the total claim] was well within the ball park, i.e., 98% of the jurisdictional minimum."[6] (2/13/06 Letter; Pl.'s Mem. of Law in Opp'n to Summ. J. Mot. for Dismissal 3) Similarly, Plaintiff asserts that he "cannot be faulted for making an estimate in good faith, that, as it turned out, was at least close to, if not precisely meeting, the jurisdictional minimum." (Pl.'s Mem. of Law in Opp'n to Summ. J. Mot. for Dismissal 5) From all this, Plaintiff seems to suggest that although it is certain that his claims never could have reached the minimum jurisdictional threshold, the Court should retain

---

[6]Actually, even with every assumption in favor of Plaintiff, the amount in controversy is barely over 90% of the jurisdictional minimum. *See supra* Part II.C

jurisdiction because Plaintiff made a good faith effort in asserting his claim and, in any event, Plaintiff comes very close to reaching the $75,000 minimum. This turns the rule on its head. First, Plaintiff ignores the axiom that a "[f]ailure of subject matter jurisdiction, of course, is not waivable," and "[i]f subject matter jurisdiction is lacking, the action must be dismissed." *Oscar Gruss & Son, Inc.*, 337 F.3d at 193 (quotations and citations omitted).

Second, when Plaintiff's counsel was asked at oral argument how he arrived at a good faith estimate that his damages were more than $75,000, the best explanation he could muster was that it was a "good faith estimate" and "that there was an audit that showed flaws and several years in which the company wasn't getting money and there was some business." (12/19/05 Tr. 8) Yet, when pressed to explain how that could possibly support a claim for $75,000, counsel for Plaintiff acknowledged that "[a]gain, I don't think it showed $75,000, but I think it showed discrepancies in the reporting of the moneys due to [Plaintiff]." (12/19/05 Tr. 8) After conceding that his estimate of the claims was based on little beyond his purported "good faith estimate," counsel argued that nevertheless, bringing his claim in federal court was appropriate because he could not have discovered that his claims fell below the jurisdictional minimum until he brought the suit in federal court. (12/19/05 Tr. 9) Such circular reasoning has no friend in the law. As Judge Easterbrook put it:

> No one is entitled to file in federal court and throw on the defendant (and the judicial system) the entire burden of estimation plus the risk of uncertainty in that process. To the contrary, Fed. R. Civ. P. 11(b)(3) requires the plaintiff (personally or through counsel) to establish evidentiary support, or at least a likelihood of obtaining that support, *before* filing suit in federal court. What [Plaintiff's] lawyer contends – that a plaintiff may file a federal suit with no basis for an assertion that the stakes exceed $75,000, and then use the discovery process to have the merits resolved

> ahead of any jurisdictional inquiry . . . does nothing other than confess a violation of Rule 11.
>
> When the monetary value of a controversy cannot be estimated, litigation must commence in state court.  If evidence developed in state litigation shows that the value exceeds the jurisdictional minimum, then the defendant may remove the suit under 28 U.S.C. §§ 1441(a) and 1446(b).  A plaintiff may be able to move to federal court by dismissal and refiling if time remains in the statute of limitations.  Not until it becomes evident that the [claim] is worth more than $75,000 should anyone knock on the federal court's door.

*Macken ex rel. Macken v. Jensen*, 333 F.3d 797, 800-01 (7th Cir. 2003).

Third, Plaintiff's claim that his estimate was made in good faith is open to serious doubt. Plaintiff's counsel contends that "there was no way that Mr. Graubart knew or could have known when he filed his complaint that his claim was for less than the jurisdictional amount."  (2/13/06 Letter)  Yet, Plaintiff's counsel brazenly confirms in the same letter that at the time the Complaint was filed, Plaintiff "was only able to confirm, by extrapolating from the royalties he received, that [JII's] gross was in excess of $160,000."  Using the estimating assumptions Plaintiff's counsel repeatedly accepted, (Pl.'s Mem. 3; 12/19/05 Tr. 18) for more than $75,000 to have been in controversy at the time the Complaint was filed, the films in question would have had to generate at least $600,000 in revenue (12.5% of $600,000 equals $75,000).  At most therefore, at the time the Complaint was filed, Plaintiff's good faith estimate of $160,000 in gross revenues could only support a claim for $20,000 (12.5% of $160,000 equals $20,000), $55,000 short of the jurisdictional minimum.

Perhaps recognizing the fallacy of this claim, in a last-ditch effort after oral argument, Plaintiff submitted a Declaration to explain the basis for his good faith estimate that more than

$75,000 was in dispute. The Declaration relies on: (1) conjecture that JII had sales in the United States for which he did not receive accounting or payments; (2) Plaintiff's speculation that by 2003 JII would re-release its films on DVD; (3) the licensing of one or more of JII's films to a television channel, Classic Arts International, that Defendants allegedly never reported to Plaintiff; (4) the fact that some of JII's films were licensed for broadcast in the United States and Europe, but Defendants did not provide Plaintiff with reports for similar uses in Asia, Australia, and Latin America; and (5) the success of the Ken Burns documentary, *JAZZ*, that demonstrated there was a viable market for jazz films.[7] (Graubart Decl. ¶ 4)

Plaintiff's contention for why he had a good faith basis to estimate at the time he filed the Complaint that the amount in controversy was over $75,000 amounts to nothing more than an after-the-fact attempt to rationalize the bringing of the suit in federal court. Nothing in Plaintiff's Declaration supports the inference that JII's allegedly unreported gross revenues during the time in question were close to the $600,000 that would be necessary for the Graubart Share to be over $75,000. Based on Plaintiff's knowledge at the time the Complaint was filed, he could not reasonably project that JII's allegedly unreported sales approached the additional necessary

_____

[7]After full briefing on subject matter jurisdiction and extensive oral argument on the subject, Plaintiff, for the first time, asserted in his Declaration that he stated the jurisdictional amount in good faith in the Complaint because he "assumed when filing the complaint that [if he] chose to seek the remedy of rescission of the Contract (based on the allegations of fraud, and breach of fiduciary duty), the value of the master tapes for the Series would be worth in excess of $1.5 million," and as a one-third owner he would potentially be awarded the tapes which would be worth approximately $500,000. (Graubart Decl.) The bad faith of this last minute assertion is evident and amounts to no more than a desperate attempt by Plaintiff to sustain jurisdiction. Moreover, Plaintiff's "assumption," that he could elect for rescission based on the allegations of fraud and breach of fiduciary duty runs directly counter to his counsel's stark acknowledgment at oral argument that those claims were baseless. (12/19/05 Tr. 3-4) Thus, Plaintiff's last-minute reliance on this claim can only be considered to be in bad faith.

$440,000 in revenue.  Similarly, the licensing of JII's films to Classic Arts International is not alleged, nor could it reasonably be alleged, to generate the revenue necessary to bring the amount in controversy over the jurisdictional amount.  Even more damaging is Plaintiff's supposed expectation that JII would re-release its videos in 2003 in DVD format.  Plaintiff cannot explain how JII's potential release of its videos in *2003* could have supported his good faith basis for alleging federal jurisdiction when the Complaint was filed in *2002*.  Plaintiff's allegation concerning foreign licenses is also unavailing.  The lack of any reports of JII's licensing for television broadcast in Asia, Australia, and Latin America does not reasonably support an inference that those licenses therefore existed.  Finally, Plaintiff speculated that the success of the Ken Burns ten-part *JAZZ* series established that there was a market for JII's films.  Yet, beyond the obvious fact that the *JAZZ* series and JII's films were about jazz, Plaintiff provides no reasonable basis to infer that the market for JII's films could produce revenue even remotely approaching the additional $440,000 necessary for the Plaintiff to have a good faith basis to assert federal jurisdiction.

### III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint for lack of

subject matter jurisdiction is hereby GRANTED. The Clerk of the Court is directed to close this

case.


SO ORDERED.

Dated:       April 27, 2006
             New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE